**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **L.M.F.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Case No. 5:21-cv-00382-CHW** |
| | : | |
| **COMMISSIONER** | : | |
| **OF SOCIAL SECURITY,** | : | **Social Security Appeal** |
| | : | |
| **Defendant.** | : | |
| | : | |

## <u>ORDER</u>

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff L.M.F.'s application for disability benefits. The parties consented to have a United States Magistrate Judge conduct all proceedings in this case, and as a result, any appeal from this judgment may be taken directly to the Eleventh Circuit Court of Appeals in the same manner as an appeal from any other judgment of the United States District Court. Because substantial evidence supports the Commissioner's decision, there were no errors in the ALJ's review of Plaintiff's case, and there is no constitutional violation warranting remand, the decision in Plaintiff's case is **AFFIRMED**.

## BACKGROUND

Plaintiff originally applied for Title II and Title XVI disability benefits on April 29, 2013, alleging disability beginning on August 25, 2012, based on nerve issues in her hands and legs, migraine headaches, memory loss, double vision, severe pain, and issues with sitting. (Exs. 1A, 2A). Her date last insured (DLI) was December 31, 2021. (R. 530, 629). After Plaintiff's

applications were denied initially and on reconsideration at the state agency level of review (Exs. 1A, 2A, 7A, 8A), Plaintiff requested further review before an administrative law judge (ALJ).

Since her application for benefits and first request for review by an ALJ, Plaintiff's case has been before three ALJs, all of whom issued unfavorable decisions. This is the first appeal to a district court. The first unfavorable decision was issued on February 11, 2016 (Ex. 9A), and upon Plaintiff's request for review, the Appeals Council remanded the case. (Ex. 10A). After a second hearing before a different ALJ, Plaintiff received another unfavorable decision on April 16, 2018. (Ex. 11A). The Appeals Council again remanded her case with instructions that it be heard by a different ALJ. (Ex. 12A). The current reviewing ALJ held a telephonic hearing on June 19, 2020 (R. 65-89), and a supplemental telephonic hearing on December 17, 2020, because of technical difficulties connecting with the vocational expert at the first hearing. (R. 45-62). The ALJ issued a third unfavorable opinion on February 23, 2021. (R. 12-44). Plaintiff's request for review of that decision by the Appeals Council was denied on August 30, 2021. (R. 1-6). The case is now ripe for judicial review. *See* 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner. *Id.* Rather, if the

Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if the evidence preponderates against it.

## EVALUATION OF DISABILITY

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience." *Winschel*, 631 F.3d at 1178 (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v)).

## MEDICAL RECORD

The medical record consists of primary care, emergency, and specialist physician treatment, as well as consultative exams.

Following an August 2012 car accident, Plaintiff treated with chiropractor Dr. James Peterzell for her injuries. (Exs. 16F, 17F). Plaintiff was referred to an orthopedist and for imaging of her spine. (*Id*.) Throughout this treatment with her chiropractor, Plaintiff at times showed improvement but at other times reported pain that was aggravated by driving and standing. *See,*

*e.g.*, (R. 1200, 1212). Her prognosis remained guarded. (R. 1215, 1222). Plaintiff's last chiropractic visit was in January 2013. (R. 1278).

Dr. Matovu at Middle Georgia Immediate Care served as Plaintiff's primary care physician throughout most of the record. The beginning of treatment with Dr. Matovu overlapped with chiropractic treatment for Plaintiff's injuries from the car accident. Plaintiff saw Dr. Matovu on September 12, 2012, and reported neck and radiating low back pain with numbing and tingling. (R. 909-910). Nothing in this visit's notes describes Plaintiff's gait. *See* (R. 908-911). On October 1, 2012, Plaintiff followed-up with Dr. Matovu. (R. 908). Plaintiff showed spinal tenderness and a normal gait. (*Id*.)

Dr. Matovu saw Plaintiff on December 3, 2012, to reevaluate her headaches, low back pain, and neck pain. (R. 905-906). Plaintiff reported having been to a pain specialist and only taking Norco and Tizanidine. (R. 906). Plaintiff had spinal tenderness and restricted range of motion of her neck. (R. 906-907). Her gait was normal. (R. 907). Because Plaintiff was still experiencing pain, Dr. Matovu referred Plaintiff for an MRI. (R. 906). The December 2012 MRIs of Plaintiff's cervical and thoracic spine showed findings consistent with ligament damage and whiplash injury. (R. 889). The cervical MRI also showed mild multilevel spondylosis with C5-C6 most affected. (R. 1163). There were mild degenerative changes shown on the lumbar spine MRI. (R. 1160). Plaintiff had a minimal bulging disc at T7-T8. (R. 1164).

Plaintiff visited the Houston Medical Center Emergency Department (ED or ER) for back, arm, and leg pain in February 2013, where she reported a history of chronic pain from degenerative disc disease. (R. 875). She also complained of pain on the left side of her body and incontinence related to the August 2012 car accident. (R. 876). Physical examinations of her back and neck were

normal, and no concerns were noted about her mental state. (R. 878-879). She was discharged home. (R. 880).

At a follow-up in March 2013 with Dr. Matovu, Plaintiff continued to complain about worsening neck and back pain and headaches and reported insomnia. (R. 904). Her bloodwork showed elevated TSH levels, for which Plaintiff was not taking her medication. (*Id.*) Plaintiff had received steroid injections. (*Id.*) The physical examination showed pain and restricted range of motion in her neck, but not in her back. (R. 904-905). Her gait was normal. (R. 905). Dr. Matovu prescribed medications for pain and hypothyroidism. (*Id.*) Dr. Matovu noted that Plaintiff's condition might suggest surgery (R. 904), but no surgery is suggested in any of the remaining record after this date. After continuing to experience back and neck pain, Plaintiff went to the ED in late March. (R. 885). Notes indicate Plaintiff walked slowly with a cane. (*Id.*) She also reported a migraine. (*Id.*) There were no acute findings, and Plaintiff was discharged home. (R. 888-889).

On April 26, 2013, Plaintiff saw Dr. Matovu for complaints of neck and low back pain, which Plaintiff connected to her car accident. (R. 902). Dr. Matovu noted that Plaintiff moaned getting on and off the examination table and cried with pain. (*Id.*). Plaintiff stated that she was handicapped and that she was using a walker. (*Id.*) Other notes, however, indicate Plaintiff walked with a normal gait. (R. 903, 1118). Plaintiff had tenderness in her back and a limited, painful range of motion in her neck. (R. 902).

Also in April 2013, Dr. Matovu completed a medical source statement for Plaintiff, which reflected a diagnosis of neck pain, low back pain, and spinal stenosis. (R. 900). She checked that Plaintiff did not ambulate effectively, had positive straight leg tests, would need to change positions once every two hours, and experienced moderate pain. (*Id.*) Dr. Matovu limited Plaintiff to working only 2 hours per day and sitting or standing in only 15-minute intervals. (*Id.*) She

suggested Plaintiff was unable to lift objects or stoop but could bend occasionally and move her neck to a limited extent. (R. 901).

Plaintiff next saw Dr. Matovu in September 2013, where she requested stronger medications for worsening pain and headaches. (R. 1115). Her spine was tender during the physical examination and her gait was normal. (R. 1116). She was unable to complete the straight leg raise test. (*Id*.) Dr. Matovu completed a form to assist Plaintiff in getting a handicap parking permit, on which she indicated that Plaintiff used a cane and was severely limited in her ability to walk due to an arthritic, neurological, or orthopedic condition. (R. 1151).

In October 2013, Plaintiff continued to complain about neck and back pain with tingling and numbness radiating into her leg. (R. 1113). Plaintiff stated that she was unable to work because she could not stand very long and fatigued easily. (*Id*.) She walked slowly and used a cane. (R. 1114). Plaintiff's back was tender upon physical examination. (*Id*.) At Plaintiff's December 2013 appointment, she continued to complain of neck and back pain. (R. 1110). Notes stated that Plaintiff walked slowly "with a lot of effort" which led to Dr. Matovu questioning "some degree of exaggeration." (R. 1111). Dr. Matovu ordered x-rays of Plaintiff's back. (*Id*.)

Plaintiff saw Dr. Matovu in March 2014, where she complained of continuing pain in her hips, shoulders, neck, and low back and depression. (R. 1107). X-rays showed only minimal degenerative changes. (*Id*.) Plaintiff's gait was normal, but she walked slowly and used a cane. (R. 1108). Her medications were continued, and Effexor was added for Plaintiff's depression. (*Id*.)

In April 2014, Plaintiff again visited Dr. Matovu for neck pain. (R. 1104). Dr. Matovu referred Plaintiff to the Spine and Neck Clinic at Emory. (R. 1105). Dr. Matovu stopped Plaintiff's Effexor and Cipro and prescribed Celebrex as treatment for Plaintiff's depression and anxiety. (*Id*.) Plaintiff saw Dr. Matovu for re-evaluation of neck pain in May 2014, where Plaintiff stated she

6

had not followed through with providing needed information to Emory. (R. 1102). Plaintiff had neck pain with a restricted range of motion. (*Id.*) Dr. Matovu gave the Emory Clinic information to Plaintiff again and counseled regarding injury prevention and exercise. (R. 1103).

Plaintiff went to the ED after dropping a piece of furniture on her hand on May 26, 2014. (R. 1026). Notes indicate her gait was normal, without back or neck pain. (R. 1028). X-rays revealed no fracture, but Plaintiff was referred to an orthopedist due to the contusion on her hand. (R. 1030-1031). On June 4, 2014, Plaintiff went to the ED with chest pain, cough, and congestion. (R. 1020). She was diagnosed with acute bronchitis and chest wall pain before being discharged home. (R. 1023). Plaintiff went to the ED again on July 22, 2014, for migraines and body aches. (R. 1015). Notes indicate she did not appear to be in distress. (R. 1017). Her back showed some trigger point tenderness, but both her back and neck had normal ranges of motion. (*Id.*)

At a routine follow-up with Dr. Matovu in August 2014, Plaintiff appeared fatigued, had spinal tenderness, and walked with a normal gait despite using a cane. (R. 1099, 1101). Notes indicate that Dr. Matovu provided a psychiatric referral for Plaintiff's depression and anxiety and rescheduled an appointment at Emory for Plaintiff's neck disorder. (R. 1100). In November 2014, Plaintiff saw Dr. Matovu for pain management and a cough with shortness of breath. (R. 1097). Plaintiff's gait was normal. (R. 1098).

On December 16, 2014, Plaintiff visited the ED with complaints of migraines along with chronic back pain. (R. 1010). Plaintiff also reported having run out of hydrocodone. (*Id.*) No acute back pain was noted. (R. 1012), Plaintiff returned to the ED in March 2015, for low back and left hip pain after Norco failed to relieve her symptoms. (R. 1006). Her neck, back, and upper and lower extremities showed normal ranges of motion. (R. 1008).

Plaintiff followed up with Dr. Matovu in January 2015 and reported miscellaneous body pain, headache, and fatigue. (R. 1095). Plaintiff had back tenderness and was unable to do a straight leg raise test. (R. 1096). Plaintiff used a cane and leaned to the left when walking. (*Id*.) Dr. Matovu completed a medical statement related to Plaintiff's TANF application in January 2015 in which she labeled Plaintiff's prognosis as "fair" and opined Plaintiff would never be able to take place in work activities because no accommodations could be made for Plaintiff's conditions. (Ex. 8F).  At a February 2015 appointment, Plaintiff reported continued pain and requested to restart Savella for her fibromyalgia, after having stopped it. (R. 1092). Plaintiff walked with a leaning gait, but the notes do not indicate any cane use. (*Id*.) Plaintiff reported spotting and abdominal pain in April 2015. (R. 1090). Notes indicated she was not taking her thyroid medication as directed. (R. 1091). Plaintiff explained she stopped taking her fibromyalgia medications because she wanted to get an injection at the ED and to have her pain medications increased. (*Id*.)

In May, June, and August 2015, Plaintiff reported that her pain was not well controlled and told Dr. Matovu that she had been unable to find a pain management specialist who would accept her insurance. (R. 1086, 1088, 1483). A note from the June and August 2015 visits indicates Dr. Matovu and other staff's observations of potential drug seeking behavior by Plaintiff. (R. 1086, 1483). Plaintiff was using a cane at the appointments, which was associated with her low back pain, but her gait was labeled as normal. (R. 1087, 1089).

Plaintiff was taken to the ED by ambulance on August 23, 2015, with complaints of heart palpitations. (R. 985, 993-999). Plaintiff disclosed her fibromyalgia and chronic neck and back pain, but she had no back and neck pain during the physical examination. (R. 985, 987). Plaintiff admitted to not taking some of her medications. (R. 985). Plaintiff was diagnosed with a UTI,

hypothyroidism, and palpations. (R. 991). Plaintiff was discharged with instructions to follow-up with her primary doctor. (*Id.*)

Plaintiff did not appear for a September 10, 2015 appointment with Dr. Matovu. (R. 1480). However, Plaintiff went to the ED on September 19, 2015, for elevated blood pressure accompanied by blurry vision. (R. 973). She reported no pain, but she believed she may have had a panic attack related to a fight with her significant other. (R. 974, 977). Plaintiff was tearful but in no other visual distress. (R. 975). She had no neck or back tenderness and showed normal ranges of motion. (*Id.*) Plaintiff was given Ativan by IV and prescription for Xanax to be taken as needed. (R. 977).

After experiencing anxiety, mild chest pain, and shortness of breath on September 27, 2015, Plaintiff went to the ED again. (R. 960). Plaintiff disclosed a history of panic attacks, and notes indicate Plaintiff had difficulty focusing and answering questions upon intake. (*Id.*) Upon physical examination, no neck or back tenderness were noted. (R. 963). Plaintiff improved and was discharged. (R. 966).

At an October 5, 2015 appointment, Plaintiff complained to Dr. Matovu about panic attacks and feeling overwhelmed. (R. 1083). Dr. Matovu noted that Plaintiff's coordination was normal despite walking with a cane. (*Id.*) Dr. Matovu prescribed alprazolam and referred Plaintiff to a psychiatrist for evaluation and management of the panic attacks. (*Id.*)

Plaintiff returned to the ED on October 13, 2015, after experiencing dizziness and popping in her ears. (R. 942). She disclosed taking several medications to manage pain, high blood pressure, and panic attacks. (R. 943). While Plaintiff reported chronic pain, she had a normal range of motion and no tenderness in her neck or back. (R. 943-944). Her upper extremities had normal ranges of

motion. (R. 944). The treatment notes do not describe Plaintiff's gait or note the use of a cane. Head CT scans and chest x-rays were normal. (R. 957-958).

Plaintiff had a routine follow-up appointment with Dr. Matovu on November 2, 2015. (R. 1081). Plaintiff reported that her pain was well-controlled. (*Id.*) Plaintiff's gait was normal despite walking with a cane. (*Id.*). Plaintiff expressed feeling stressed and overwhelmed. (*Id.*) Dr. Matovu prescribed Zoloft to treat Plaintiff's depression. (R. 1081). She also counseled her on diet and mild exercise for her diabetes. (R. 1082)

On November 5, 2015, Plaintiff returned to the ED with chest pain and shortness of breath. (R. 1132). Plaintiff explained that she had been prescribed Zoloft and a new blood pressure medicine, but she had not picked up the prescription. (*Id.*) She also noted a cardiologist referral. (*Id.*) She later disclosed taking herself off her blood pressure medication in anticipation of the new prescription. (R. 1130). Plaintiff also reported headaches and intermittent tingling. (R. 1131). Treatment notes do not indicate whether Plaintiff had any back or neck pain, but they show that Plaintiff easily moved her extremities. (*Id.*) An EKG showed no acute ischemic changes. (R. 1132). The notes also reflect Plaintiff's recent diabetes diagnosis and her obesity. *See, e.g.*, (R. 1134). Plaintiff was stabilized in the ED before being admitted. (R. 1128, 1132). She was discharged the following day. (R. 1136, 1139).

Following her discharge from the hospital, Plaintiff reported for a stress test in November 2015. (R. 1035). Treatment notes state that Plaintiff had difficulty walking due to back pain and walked with a cane. (*Id.*) She complained of bilateral leg pain. (R. 1036). At her December 2015 cardiology appointment following the stress test, which was negative, Plaintiff was no longer experiencing chest pain. (R. 1033, 1041). Nothing in the notes describes her gait or states that she

walked with a cane or walker. *See* (R. 1033-1034). Plaintiff denied joint stiffness and muscle aches. (R. 1034).

Plaintiff had a routine follow-up appointment with Dr. Matovu in December 2015, and reported similar issues to those noted at her November appointment. (R. 1078). Dr. Matovu noted that Plaintiff's gait was normal despite walking with a cane. (*Id*., R. 1079). Lumbar x-rays from December 16, 2015, showed minimal degenerative changes, and her spine was largely unchanged compared to films from June 2011. (R. 1066).

At Plaintiff's February 2016 visit, Plaintiff reported that her pain was well controlled, but she asked for a walker to ease her leg pressure. (R. 1323). Plaintiff's coordination was normal, but she used a cane to walk. (R. 1324). Dr. Matovu noted "rollator walker" underneath "muscle weakness" in her treatment plan notes. (R. 1325). Dr. Matovu observed that Plaintiff seemed to be doing well mentally. (R. 1323). At Plaintiff's follow-up in April 2016, Plaintiff again reported well controlled pain and mentioned a walker. (R. 1320). Her coordination was normal, but she walked with a cane. (R. 1321). The notes again suggest a "rollator walker" as part of her treatment plan. (R. 1322). Plaintiff's condition at her June appointment was basically the same, although the treatment plan does not mention a walker. (R. 1317-1319)

In a treating source statement completed in April 2016 (Ex. 14F), Dr. Matovu opined that Plaintiff would be off task at least 25% of the workday and miss more than 4 days of work each month. (R. 1154). She limited Plaintiff's ability to lift and carry items less than 10 pounds but only rarely. (R. 1155). Dr. Matovu described pain throughout Plaintiff's body, sedation due to medication, and anxiety. (*Id*.) She also stated that Plaintiff would not be able to stand more than 30 minutes at a time before she needing to rest. (*Id*.). Dr. Matovu checked that Plaintiff required a cane and could walk one block without it. (R. 1155-1156). She did not severely limit Plaintiff's

extremity use. *See* (R. 1156). However, she suggested that Plaintiff could never climb, balance, stoop, kneel, crouch, or crawl. (R. 1157).

In August 2016, Plaintiff reported to Dr. Matovu that having the walker had helped her. (R. 1314). She also reported that her pain was fairly well controlled. (*Id*.) The same was true at her November 2016 visit. (R. 1309-1311).

Plaintiff presented to the ED on January 3, 2017, with complaints of cough and congestion. (R. 1365). Plaintiff also complained of increased symptoms relating to fibromyalgia following flu-like symptoms. (R. 1365-1366). No back or neck pain was noted, and her gait was normal. (R. 1367-1368). At her January 2017 appointment with Dr. Matovu, Plaintiff stated that she could not stand, although her pain was fairly controlled. (R. 1306). Dr. Matovu observed that Plaintiff appeared less anxious than in previous visits. (R. 1307). Plaintiff had tenderness in her low back and used a walker. (R. 1307). Dr. Matovu provided a disability letter at Plaintiff's request (R. 1308), which stated that Plaintiff is medically disabled and has been for at least 12 months. (R. 1289).

Plaintiff was taken to the ED by ambulance after experiencing dizziness on April 13, 2017. (R. 1339). Plaintiff admitted to first responders that she had not been taking medications as directed. (R. 1354). She was discharged home. (R. 1348). At March 2017 and June 2017 appointments with Dr. Matovu, Plaintiff's condition was largely unchanged, and she continued to use a walker. (R. 1300-1301, 1303). Her coordination was normal. (R. 1301, 1304). She showed diminished motor strength. (*Id*.).

Plaintiff returned to the Houston Medical Center ED on June 17, 2017, requesting a pregnancy test. (R. 1329). She had no neck or back pain upon physical examination, and her gait was normal. (R. 1332, 1333). Once testing confirmed the pregnancy, Plaintiff asked to be

discharged without further workup. (R. 1333). She was released with direction to see her obstetrician. (R. 1335).

On August 27, 2017, Plaintiff went to the ED with complaints of a yeast infection, which over-the-counter medication had not cured. (R. 1418). She was discharged home. (R. 1421). After experiencing a fast heart rate the following day, Plaintiff was transported by ambulance to the ED. (R. 1394-1395). She was ambulatory upon arrival. (R. 1395). Plaintiff was 5 months pregnant and diagnosed with preeclampsia. (R. 1399). Plaintiff's diagnoses also reflect medication noncompliance. (*Id.*) She was given IV insulin and fluids and counseled on taking her medications as prescribed. (*Id.*) At both visits, the physical examination revealed no pain or tenderness in her back and neck. (R. 1397, 1420).

At a follow-up with Dr. Matovu's office in November 2017, Plaintiff had elevated blood pressure and stated that she did not understand how to manage her blood sugar and insulin despite receiving a sliding scale and explanation from a nurse (R. 1556). Plaintiff received a referral to a high-risk OB for further evaluation. (R. 1558). Notes indicate Plaintiff was using a walker. (R. 1557, 1560). In December 2017, Plaintiff explained that she missed her obstetrics appointments due to caring for her grandmother and stated that she did not understand her treatment plan. (R. 1553). She was using a walker. (R. 1554). Dr. Sogade made another referral to the high-risk obstetrician.[1] (R. 1555). Plaintiff admitted that she had not been taking her blood pressure medication. (R. 1555).

On May 12, 2018, Plaintiff went to the ED after experiencing generalized pain and requested medication refills after running out of medicine and being unable to see her primary care physician due to insurance. (R. 1383). She rated her back pain as an eight on a pain scale of 10 and

---

[1] No record reflects the delivery date for this pregnancy, but Plaintiff testified at the first hearing that she had a two year-old child. (R. 73).

reported having intermittent headaches. (R. 1383, 1385). Plaintiff's gait was normal. (R. 1387). Plaintiff did not require any imaging or other testing. (R. 1389). Treatment providers refilled her blood pressure medication and referred her to another provider for chronic pain management. (*Id.*)

Plaintiff had several maintenance and follow-up appointments with Dr. Matovu from mid-2018 through mid-2019. In June 2018, Plaintiff expressed grief about a daughter dying. (R. 1549). She also noted that her pain meds were stolen. (*Id.*) Notes show that her coordination was normal, she used a walker, and she had diminished motor strength. (R. 1550). In August 2018, Plaintiff showed tenderness at several points. (R. 1546). She used a walker, although her pain was controlled. Her condition remained the same at her September and October 2018 visits. (R. 1540-1544).

In March 2019, Plaintiff visited Dr. Matovu with concerns that she may have breast cancer. (R. 1462). She was using a walker. (R. 1463). Plaintiff had no new complaints in May 2019. (R. 1534). Dr. Matovu gave Plaintiff a list of pain clinics. (R. 1536). At an appointment in early August 2019, Dr. Matovu noted Plaintiff's non-compliance with metformin. (R. 1533). At a late August appointment for a blood pressure check, Plaintiff reported being out of pain medications for at least a month. (R. 1509). She again expressed worry that she might have breast cancer after having to repeat an ultrasound. (*Id.*) She was using a walker (R. 1510). Dr. Matovu continued to counsel Plaintiff on compliance with blood pressure and diabetes medications. (R. 1511). Plaintiff reported that her pain was well controlled at her October 2019 appointment. (R. 1503). Plaintiff admitted she did not take her blood pressure medications as directed by her nephrologist because she wanted to check with Dr. Matovu. (R. 1504). Plaintiff had back tenderness during her physical examination. (*Id.*)

Also in October 2019, Plaintiff saw nephrologist Dr. Singanamala for a consultation regarding uncontrolled hypertension. (R. 1427). Plaintiff had only been taking her medication for two months out of fear of mixing them. (*Id*.) Plaintiff had neck pain, back pain, and other body aches during the physical exam. (*Id*.) Dr. Singanamala listed a gait abnormality but did not note whether Plaintiff used a cane or walker. (R. 1428). Plaintiff was assessed with chronic kidney disease. (R. 1429).

At Plaintiff's November 2019 appointment with Dr. Matovu, Plaintiff again reported that her some of her medications had been stolen. (R. 1500). Notes state that she was walking with a walker but had "no trouble walking." (R. 1500-1501). Plaintiff showed back tenderness during the physical examination. (R. 1501). While Dr. Matovu noted Plaintiff's story about the stolen medications, Dr. Matovu also noted her suspicions that Plaintiff was non-compliant. (R. 1502). In January 2020, Plaintiff remained non-complaint with her some of medications while being "fixated" on pain medications. (R. 1497-1498). At Plaintiff's February 2020 follow-up with Dr. Matovu, Plaintiff appeared anxious and disorganized and tried to convince Dr. Matovu she had been compliant on her medications. (R. 1495). However, the medicine bottles did not support compliance and the pharmacy stated that Plaintiff had not picked up her medications. Notes show that Plaintiff had no trouble walking although she walked with a cane. (R. 1497).

Plaintiff saw Dr. Shabbir in February 2020 for a cardiac follow-up appointment. (R. 1446). Plaintiff stated she had been compliant on her medications. (*Id*.) He increased Plaintiff's blood pressure medication. (*Id*.) Plaintiff could not complete a physical stress test due to pain. (*Id*.) Plaintiff ambulated normally at this appointment. (R. 1447). Notes do not mention if Plaintiff used a walker or cane. *See* (R. 1446-1447). At a nephrology follow-up appointment in February 2020, Plaintiff reported feeling anxious. (R. 1432). Her condition was largely unchanged. A November

2020 medical records request notation explained that Plaintiff had cancelled or failed to appear for several scheduled appointments since February 2020. (R. 1572).

At an April 2020 follow-up appointment with Dr. Matovu, Plaintiff's pain was controlled. (R. 1493). Plaintiff was using a walker and notes describe her as handicapped. (*Id.*) Dr. Matovu noted that Plaintiff's adherence to her treatment plan and medications was "tremendously improved." (R. 1494). By June 2020, Plaintiff's daughter had passed away due to COVID-19, and Dr. Matovu observed prevalent depression symptoms despite Plaintiff appearing less anxious. (R. 1491). Plaintiff was still using walker, but nothing reflects diminished motor strength. (*Id.*)

Plaintiff visited Dr. Stokley at Pavillion Family Medicine Center in September 2020 to establish herself as a new patient because the practice was closer to her home than Dr. Mantovu. (Ex. 32F, R. 1596). Plaintiff reported that she needed medication refills, had not taken her blood pressure, thryroid, or diabetes medications, and had failed to follow-up with her nephrologist. (R. 1596). Plaintiff described her chronic and acute pain as 10/10 after having been without any medicine for a few weeks. (*Id.*) During the physical examination, Plaintiff's neck had a full range of motion and normal cervical lordosis, although Plaintiff had some cervical muscle tenderness. (R. 1597-1598). Plaintiff had pain and tenderness in her back, but the straight leg tests were negative for both legs. (R. 1598). Plaintiff demonstrated 5/5 motor strength and normal muscle tone throughout her body. (R. 1599). Notes indicate that Plaintiff did not exercise due to pain (R. 1597), and nothing reflected that Plaintiff walked with a walker or cane. Plaintiff followed-up with Dr. Stokely in October 2020, where her conditions remained the same. (R. 1585-1589)

*Consultative Examinations*

In June 2013, Dr. Stanley Wallace saw Plaintiff for a consultative physical examination, which included a review of Plaintiff's medical records and referral for additional radiological

testing. (Ex. 5F). At the examination, Plaintiff reported that she had experienced radiating pain throughout her body for a least a year and that a cane had been prescribed by a doctor for stability. (R. 916). She rated her current pain as 9 out of 10. (*Id.*) She also reported issues relating to high blood pressure but was not taking any blood pressure medication. (*Id.*) She disclosed taking Norco for pain and related an episode of severe headaches to the medication. (*Id.*) Dr. Wallace observed that Plaintiff related poorly, was a poor historian, and has "difficulty attending to personal needs," but he stated that she was capable of handling funds. (R. 917, 919).

Upon physically examining Plaintiff, Dr. Wallace noted that her gait was normal and that she used a cane to walk but did not require it. (R. 917, 923). Dr. Wallace noted that Plaintiff was tearful with a depressed affect. (R. 917). He observed mild motor loss in the left upper extremity due to pain. (R. 918). He noted that most of Plaintiff's range of motion was affected more by her obesity rather than arthritic disorder. (*Id.*) Her abilities to lift, squat, and hop were impaired. (R. 918-919). Plaintiff's straight leg tests were normal. (R. 918). X-rays of Plaintiff lumbar spine revealed no fracture and no spondylosis. (R. 915). Dr. Wallace limited Plaintiff's exposure to heights and other hazards due to her opioid use. (R. 919).

Plaintiff saw Dr. Robert Foster for a consultative psychological examination in October 2013. (Ex. 6F). Plaintiff reported injuries from the August 2012 car accident and impairments consistent with her disability application. (R. 926-927). Plaintiff described her history with depression and explained how it had progressed since the car accident and why she had discontinued her medication. (R. 927). Dr. Wallace noted that Plaintiff walked with a limp and used a cane. (R. 928). Plaintiff explained her employment and work history, both of which ended after the car accident. (R. 927). She described her daily activities and the assistance her children

provide, such as with chores and helping Plaintiff out of the shower, due to her pain and difficulty moving and lifting. (*Id*.)

Dr. Wallace noted Plaintiff's teary demeanor and blunted affect, but he found her able to give information in a logical manner. (R. 928). Plaintiff completed cognitive assessments, which resulted in a full scale IQ score of 63 or "within the mentally deficient range." (R. 928-929). However, he described Plaintiff's ability to reason through tasks within the borderline range. (R. 929). An assessment measuring scholastic achievement showed Plaintiff's word recognition and sentence comprehension within the third and second grade levels, with math skills within the second grade level. (R. 929-930). Dr. Wallace assessed Plaintiff with "depression secondary to medical diagnosis and related diminished independence." (R. 930). He limited Plaintiff's ability to comprehend simple tasks, interact with coworkers and the public, and manage her finances if awarded benefits. (*Id*.)

*Hearing Testimony and Function Reports*

Plaintiff testified at both hearings in front of the ALJ. Plaintiff explained that she only completed seventh grade and has limitations with reading and writing. (R. 72). Her children were grown except for a two-year old son. (R. 73). Plaintiff explained that she had received rental income for two rooms in her home until a tree fell on the house. (*Id*.) She denied it was business income. (*Id*.) Plaintiff stated she received food stamps and that her daughter planned to move in to help Plaintiff around the house. (R. 75). Plaintiff dated her issues with walking and standing back to the 2012 car accident. (R. 77). She stated that she has used a cane or a walker since 2012 and that it was prescribed for her. (*Id*.) She reported only being able to walk five or six steps before having to sit down or feeling like she would fall. (R. 77-78). She described her hip "popping out" and stated that her left leg drags. (R. 82). Even with the walker, Plaintiff said it takes her 20-30

minutes to go the mailbox. (R. 81-82). She denied being able to climb stairs. (R. 87). She stated that she can only pull or lift a half-gallon of milk and that she often drops things, like dishes, around the house. (R. 78). She limited her abilities to drive, do laundry, cook, and perform other household chores. (R. 82-85). She explained the trouble she had with memory or tasks like taking medications. (R. 79). Plaintiff explained that she has had light sensitivity that causes headaches and migraines since the car accident and that she has other issues with concentration. (R. 79-80). At the supplemental hearing, Plaintiff stated that she had experienced additional issues relating to stress and that she had been treating with a therapist. (R. 51-52). Her testimony and function reports are largely consistent, although Plaintiff also discussed having panic attacks in her 2014 report. (Exs. 7E, 10E).

## DISABILITY EVALUATION

Following the five-step sequential evaluation process, the reviewing ALJ made the following findings in this case. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 25, 2012, the alleged onset date. (R. 18). Plaintiff's date last insured was December 31, 2021. (*Id*.) At step two, the ALJ found that Plaintiff suffered from the following severe impairments: hypertension; diabetes mellitus with neuropathy; obesity; osteoarthritis; degenerative disc disease; chronic kidney disease stage-II; and headaches. (R. 19). He also found that Plaintiff suffered from cystitis, bronchitis, myalgia, hand contusion, hypothyroidism, arrhythmia/palpitations, allergies, vertigo, menorrhagia, and fine tremors of her right hand, but found that these impairments were non-severe. (*Id*.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments meeting or medically equaling the severity of one of the listed impairments. (R. 19-20). Therefore, the ALJ assessed

Plaintiff's RFC and determined that Plaintiff could perform light work, with the following limitations:

- [Plaintiff] should never climb ladders, ropes, or scaffolds or have similar hazard exposure;
- She can occasionally perform postures of climbing ramps or stairs, balancing, and stooping, but she should never kneel, crouch, or crawl;
- She can perform simple tasks;
- She should not perform production rate pace of assembly line work;
- She can have occasional interaction with the public; and
- Consistent with light exertion, she can lift/carry 20-pounds frequently and 10-pounds occasionally, and she can alternate sitting and standing for 5 minute durations at for [sic] 30-minute intervals; this incidental posture shift does not cause significant time off task.

(R. 21).

Based on this RFC, the ALJ found at step four that Plaintiff is not capable of performing any past relevant work. (R. 32). Pursuant to step five, the ALJ determined that there are jobs existing which Plaintiff can perform: racker, basket filler, table worker, dowel inspector, and agricultural sorter. (R. 33). As a result, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act at any time from August 25, 2012, through the date of the decision. (R. 34).

## ANALYSIS

Plaintiff argues that the ALJ's RFC describing Plaintiff as capable of light work is not supported by substantial evidence because the ALJ did not properly apply the treating physician rule to the medical records and opinion. (Doc. 16, p. 3-15). Plaintiff also asserts that ALJ did not properly consider Plaintiff's mental health limitations and argues that the ALJ was without

authority to decide her case, thus violating her constitutional rights. (*Id.,* p. 14-19; Doc. 23). As discussed below, the ALJ applied the correct legal standards, thoroughly considered the record, and clearly articulated his opinion. The RFC is supported by substantial evidence. There is also no constitutional issue which warrants remanding Plaintiff's case.

1. The ALJ appropriately applied the treating physician rule.

Plaintiff argues that the ALJ incorrectly considered the opinions and records of Dr. Matovu, Plaintiff's long-term treating physician; failed to articulate his reasoning for discounting the opinions; and misconstrued several portions of the record leading to an unsupported RFC. (Doc. 16, p. 3-15). Plaintiff's argument is based upon the ALJ's failure to apply 20 C.F.R. §§ 404.1527 and 416.927[2] and the treating physician rule. Despite Plaintiff's arguments to the contrary, the Court finds that the ALJ appropriately applied the correct legal standards when considering Plaintiff's treating physician opinion and records and that those considerations were accounted for when developing Plaintiff's light work RFC.

The Treating Physician Rule

The treating physician rule is well-established and applies to Plaintiff's case. Opinions of treating physicians are entitled to "substantial or considerable weight unless 'good cause' is shown to the contrary." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause may be established when "(1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent

---

[2] On March 27, 2017, the Social Security Administration revised the regulations regarding medical opinions from a claimant's treating sources. The regulations now specify that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Because Plaintiff's application was filed in April 2013, the prior regulations apply.

with the doctor's own medical records." *Id.*  To disregard or discredit the opinion of a treating physician, the ALJ must clearly articulate the reasons.  *Id.*  Additionally, in evaluating Plaintiff symptoms, "[i]f the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).

In her argument that the ALJ incorrectly assessed Dr. Matovu's opinion under the treating physician rule, Plaintiff highlights two medical source statements that Dr. Matovu completed in 2013 and 2016, in which Dr. Matovu greatly limited Plaintiff's ability to work and reflected Plaintiff's need for an ambulatory device. (Doc. 16, p. 4-5). She suggests that if the ALJ had accepted Plaintiff's need for a cane or walker, Plaintiff would have been found disabled because the vocational expert testified that walker use would preclude all work. Plaintiff then highlights portions of the treating record which she contends support Dr. Matovu's opinions and discredit the ALJ's analysis of those opinions. (*Id.*, p. 6-14). Plaintiff asserts that Dr. Matovu epitomizes the treating source because she saw Plaintiff numerous times and her records touch on nearly all of Plaintiff's severe impairments. (*Id.*, p. 5). Plaintiff also argues if the ALJ discredited those opinions, he should have ordered an updated consultative exam or re-contacted Dr. Matovu. (*Id.* p. 13-15).

The ALJ considered the medical source statements from Dr. Matovu and gave them little weight because their "limitations are unsupported by the complete longitudinal record including [Dr. Matovu's] own clinical findings." (R. 23, 27). Plaintiff contests the ALJ's assessment as well as his discussion of the medical record. Even under the treating physician rule, however, it is not only permissible, but appropriate for the ALJ to weigh a medical opinion as to disability against the complete record.

The ALJ found not only that the record as a whole failed to support the limitations described by Dr. Matovu's questionnaires, but also that the questionnaires were unsupported by her own records. For example, in affording little weight to the April 2013 questionnaire, the ALJ considered Dr. Matovu's contemporaneous treatment records as contrasted to Plaintiff's ED treatment. (R. 23). The ALJ did not ignore the notes about Plaintiff's diminished motor strength or misquote the records as Plaintiff suggests. Instead, he correctly noted that numerous records state that Plaintiff's gait and coordination were normal despite the use of a cane or walker and also noted the times that Plaintiff's physical exams were normal. (R. 25-27, 29). The ALJ correctly noted that even Dr. Matovu suggested Plaintiff was exaggerating or exhibiting drug seeking behavior. (*Id*.).

As the ALJ observed, the medical records never indicated that Dr. Matovu found that Plaintiff required an ambulatory device - only that she observed Plaintiff using one. While Dr. Matovu did document ordering a rollator walker, she did so in response to Plaintiff's request for the walker. (R. 1325). This observation, along with the above discussion, led the ALJ to discredit the April 2016 questionnaire in which Dr. Matovu suggested that Plaintiff required a cane and in which Dr. Matovu placed more severe limitations on Plaintiff's ability to work than in the 2013 questionnaire although Plaintiff's condition and symptoms remained largely the same. (R. 27, Ex. 14F). Despite Plaintiff's disagreement the ALJ's interpretation of the questionnaire, Dr. Matovu does say that she can walk a block without a cane. (R. 27, 1156). This medical opinion was assessed against the remainder of the treatment record. (R. 28-30). The ALJ did not ignore the use of a cane or walker or Plaintiff's symptoms. Instead, he considered the opinions against Plaintiff's remaining treatment records noting her pregnancy, medicine non-compliance, ability to care for family members, time periods without any medications, and consistent fixation on pain medications. (*Id*.)

Records of some later visits with Dr. Matovu specifically note that Plaintiff has no trouble walking and that Dr. Matovu often counseled Plaintiff to exercise. Moreover, there are numerous visits through the record as discussed above where Plaintiff was not in distress, had normal physical examinations, and demonstrated normal coordination. Notes like these throughout the record ultimately caused the ALJ to find the Plaintiff's treating records inconsistent with the severity of limitations Dr. Matovu proposed for Plaintiff.

Even though Plaintiff disagrees with the ALJ's interpretation of the record, the Court cannot find that the ALJ misrepresented any portion of it. The ALJ's discussion of the record was thorough and provided the appropriate clarity regarding his reasoning. A finding that an opinion is inconsistent or conclusory provides good cause for not giving a treating physician's opinion substantial weight. *Phillips*, 357 F.3d at 1240.

In his evaluation of the record and Plaintiff's symptoms, the ALJ also properly considered Plaintiff's daily activities and history, such as taking care of her youngest child and renting rooms for extra income. Plaintiff argues that the ALJ improperly equated Plaintiff's rental income to work, but such activities are appropriate things to consider when assessing medical records and opinion and whether Plaintiff is disabled. *See, e.g., Carson v. Comm'r*, *Soc. Sec. Admin.,* 300 F. App'x 741, 743 (11th Cir. 2008) (approving assigning less weight to a treating physician's opinion if different from other physicians, state agency report, consultative exams, and a claimants own statements).

The ALJ did not solely rely on Plaintiff's ability to do a few daily activities, care for her children, or rental income. These things were considered in connection with the entire record. The ALJ adequately explained the reasons for the weight he assigned to the treating physician opinion and good cause for not giving it great weight. Where the ALJ has appropriately considered the

record as a whole, this Court cannot supplement its judgment for the ALJ's judgment. *Winschel*, 631 F.3d at 1178.

Because there was no error in the ALJ's consideration of the medical opinion evidence or in his consideration of her use of an ambulatory device, there is no error in how he considered that limitation when assessing her RFC. Therefore, the RFC is supported by substantial evidence. *See* 20 C.FR. §§ 404.1546(c) and 416.946(c) (stating that the ALJ has the responsibility to assess the RFC); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004) (discussing that an ALJ is not required to include limitations in the RFC which he rejects as not supported by the record).

There is no basis for Plaintiff's suggestion that record was somehow incomplete such that ALJ was required to order an updated consultative examination or re-contact Dr. Matovu.[3] The record consisted of nearly 10 years of treatment for a condition that remained largely unchanged and a treatment plan that remained steady. No surgery was recommended, and no changes to Plaintiff's neck and back were documented other than mild degenerative changes. During her hearing testimony, Plaintiff did describe issues with her hip popping out of place and her leg dragging, but there is no evidence for these symptoms in the medical record. The records provided the ALJ with a clear, longitudinal view of Plaintiff's condition. The record was complete, and there was no basis for the ALJ to develop the record further.

---

[3] Social Security regulations contemplate ordering a consultative exam where evidentiary gaps exist or doing so is necessary to make an informed decision because of inconsistencies in the record. *See* 20 C.F.R. §§ 404.1520b(b) and 416.920b(b). The regulations do not mandate seeking this additional information. Instead, the regulations state that the agency may order a consultative exam if the agency determines it cannot reach a decision or needs additional clarification. *Id.*; *see also Jones v. Soc. Sec. Admin., Comm'r*, 857 F. App'x 587, 591 and n.1 (11th Cir. 2021) (discussing and recognizing the permissive versus mandatory nature of these regulations); *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1269 (11th Cir. 2007) (explaining "a consultative exam is not required if the record contains sufficient evidence for the [ALJ] to make an informed decision").

2. <u>The ALJ properly evaluated Plaintiff's mental health conditions</u>.

Plaintiff argues that the ALJ did not properly evaluate the severity of Plaintiff's mental health impairments even after considering Listings 12.04 and 12.06, that the ALJ failed to consider whether Plaintiff met Listing 12.05, and that the ALJ failed to properly consider the consultative examiner's opinion. (Doc. 16, p. 14-17). The Court finds no error.

a. <u>The ALJ properly considered the psychological examiner's opinion</u>.

Plaintiff argues that the ALJ was required to assign a weight instead of assigning persuasiveness to the opinion of Dr. Foster, a consultative psychological examiner. (*Id.*) This error, Plaintiff asserts, constitutes clear legal error which requires remand. Plaintiff then goes on to argue that the ALJ's reasoning for finding the opinion unpersuasive was also error. The record, however, shows no error in the ALJ's assessment of Dr. Foster's opinion.

Plaintiff is correct that when the ALJ discussed the opinion of Dr. Foster, he deemed it "unpersuasive" instead of assigning it a "weight." (R. 25; Doc. 16, p. 15). While the treating physician rule applies to the Plaintiff's case, Dr. Foster as a consultative examiner does not constitute a treating physician and is not entitled to the same deference. *Wines v. Acting Comm'r of Soc. Sec.* 2022 WL 2526586, *2 (11th Cir. 2022) (citing *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987), a treating physician rule case).  Instead, the ALJ was mandated to consider Dr. Foster's conclusions in the same manner as other medical sources. *See*, *Wines v. Acting Comm'r of Soc. Sec.* 2022 WL 2526586. This means that "[t]he ALJ must state with particularity the weight given to different medical opinion and the reasons, therefore." *Id*. at *2 (citing *Winschel*, 631 F.3d at 1179). But Plaintiff cites no statute, case, or regulation requiring that the ALJ use the word "weight." The ALJ clearly articulated reasons for finding Dr. Foster's opinion unpersuasive, and

the reasoning leaves no doubt how he measured the opinion against other evidence in the record, whether or not he used the word "weight." (R. 24-25).

      b.  <u>Consideration of Plaintiff's mental health impairments</u>

      The ALJ did not find any of Plaintiff's potential mental health conditions, such as anxiety, depression, panic attacks, or borderline intellectual functioning, either severe or non-severe. (R. 19). He did, however, consider whether her "mental impairments, considered singly or in combination [met or medically equaled] listing impairment[s]" 12.04 (depressive disorders) and 12.06 (anxiety disorders). (R. 19-20). He specifically considered whether Plaintiff's impairment met Paragraph B or Paragraph C of these Listings, which contemplates the:

> B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):
> 1. Understand, remember, or apply information (see 12.00E1).
> 2. Interact with others (see 12.00E2)
> 3. Concentrate, persist, or maintain pace (see 12.00E3).
> 4. Adapt or manage oneself (see 12.00E4)
> …
> C. Your mental disorder in this listing in "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of a least 2 years, and there is evidence of both:
> 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); *and*
> 2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

      20 C.F.R. pt. 404, subpt. P. app. 1, §§ 12.04 and 12.06 (emphasis in original).

      Under Listings 12.04 and 12.06, Plaintiff could meet the parameters of Paragraph B, either by having one extreme limitation or two marked limitations. The ALJ thoroughly discussed the parameters in paragraph B and supported his findings by citing to the record. (R. 20). The ALJ

found that Plaintiff had moderate limitations in all areas. (*Id*.) The ALJ then reviewed the parameters of Paragraph C and found that Plaintiff failed to meet them. (*Id*.) Therefore, Plaintiff did not meet the requirements of Listings 12.04 or 12.06 (R. 15). Plaintiff argues this analysis did not adequately account for Plaintiff's documented limitations, including her school records, so that it is unclear how or whether the ALJ accounted for Plaintiff's mental health impairments in the RFC. (Doc. 16, p. 14-17). Plaintiff asserts that had the ALJ accounted for these limitations he would have reached a different outcome.  (*Id*.)

Plaintiff's assertions are contradicted by the ALJ's decision. The opinion shows the ALJ did recognize Plaintiff's mental health impairments and limitations, both when considering listing impairments and when discussing Dr. Foster's opinion. (R. 19-20, 24-25). The ALJ addressed Plaintiff's childhood and school records, which reflected an IQ that the ALJ recognized would be consistent with borderline intellectual functioning. (R. 24-25 and n. 1). The ALJ noted Dr. Foster's assessment that Plaintiff had a FSIQ score of 63, which score placed Plaintiff in the mentally deficient range. (R. 24). However, he also plainly juxtaposed Plaintiff's IQ scores against inconsistencies within the record, which showed that Plaintiff is not as limited as she alleged or as the IQ scores, alone, may reflect. For example, he compared Plaintiff's testimony about her ability to read and write and her receiving special education services to what she initially disclosed in her application. (R. 24-25). He reviewed her function and disability reports to account for her ability to complete these forms. (R. 24). The ALJ was permitted to consider Plaintiff's daily activities, such as taking care of children as a single parent and managing rental income, as a basis for finding Plaintiff's mental health abilities above what she noted them to be. He considered the records and clearly articulated his reasoning for finding Plaintiff's proposed limitations unsupported by the record. Moreover, the ALJ did not ignore Plaintiff's limitations in the RFC. The RFC purposely

limited Plaintiff to simple tasks and only occasional interaction with the public, which accounted for the limitations that the ALJ discussed throughout the decision.

Plaintiff additionally argues that the ALJ erred by failing to consider Listing 12.05 due to her low functioning IQ scores. (Doc. 16, p. 14-17). Although the ALJ did not enumerate this Listing, this omission is not an error warranting remand. As explained above, the ALJ adequately explained his reasoning regarding Plaintiff's mental health limitations. Furthermore, as the Commissioner noted in her brief, a low IQ score alone does not equate to an intellectual disability that would make her disabled or equal to Listing 12.05.[4] (Doc. 22, p. 28-29). The decision is sufficiently articulated for the Court to discern how the ALJ considered Plaintiff's mental health limitations, including her IQ scores. The decision shows that he discounted those limitations based on the record and that he clearly articulated his reasoning for his decision. Substantial evidence supports the decision, both at step three and in the resulting finding that Plaintiff is not disabled due to her mental health concerns.

3.  <u>Plaintiff's challenge to the constitutionality of the Social Security Administration and the administrative adjudicatory process does not warrant remanding her case.</u>

Plaintiff originally argued that the appointment of Andrew Sauls as Commissioner of Social Security was unconstitutional and that any decision by the ALJ is constitutionally defective as a result. (Doc. 16, p. 17-19). In her reply brief, Plaintiff clarified that her challenge is not only or specifically to former Commissioner Sauls's appointment under 42 U.S.C. § 902(a)(3), but that the Social Security Administration's structure is constitutionally invalid, which means that the Commissioner had no constitutionally valid legal authority to delegate authority to the ALJ and

---

[4] To meet Listing 12.05 based on a full scale IQ score below 70, a claimant would also need to satisfy the same parameters as Paragraph B from Listings 12.04 and 12.06, which the ALJ explicitly found Plaintiff did not meet.

Appeals Council. (Doc. 23). The result, Plaintiff argues, was a violation of her constitutional rights. (*Id.*) Plaintiff's argument is without merit and does warrant remand of her case.

Both parties agree that *Collins v. Yellen,* 141 S.Ct. 1761 (2021), sets out three parameters which the Court must consider when addressing Plaintiff's constitutional challenge. They also agree that Plaintiff meets the first two parts of the analysis, in that she has standing and in that 42 U.S.C. § 902(a)(3) is unconstitutional, at least as far as it curtails the President's powers to remove the Commissioner. *See Collins,* 141 S.Ct. at 1778-1789; (Docs. 22, p. 5; 23, p. 2). The disputed factor is the last one: whether Plaintiff is entitled to any remedy for a violation of her constitutional rights. Plaintiff argues that she has suffered specific harm and that harm should also be presumed under *Collins*. (Doc. 23).

Questions as to the validity of Commissioner of Social Security's appointment, authority, delegated authority, the structure of the agency, and the effect on a claimant's constitutional rights have been examined and rejected by other Judges in the Middle District. In *L.M. v. Comm'r of Soc. Sec.*, 2021 WL 8268034 (M.D.Ga, Dec. 3, 2021), the court rejected the plaintiff's remand argument challenging the authority of the Commissioner based upon his appointment and removal in the context of *Collins* and *Seila Law LLC v. Consumer Financial Protection Bureau*. 140 S. Ct. 2183 (2020). Even though L.M. did not specifically challenge whether the hearing ALJ was unconstitutionally appointed as Plaintiff does here, the court found that such an argument would be meritless because "the unconstitutional removal restriction, regardless to whom it applies, does not invalidate every action taken by the Social Security Administration." *L.M.*, 2021 WL 8268034 at *1 n. 1.

In a case where the parties also consented to have a magistrate judge decide the case, the court likewise rejected the plaintiff's constitutionality argument in *G.E.H. v. Comm'r of Soc. Sec.*,

2022 WL 4235060 (M.D.Ga, Sept. 14, 2022). Unlike in *G.E.H.*, Plaintiff did raise a challenge to the authority of the Commissioner prior to her appeal. Nevertheless, as in that case, Plaintiff in this case has not established a connection between the unconstitutional provision and the ALJ's decision or any "harm beyond an allegedly unconstitutional administrative adjudicatory process." *Id*. at 8-9. Further, as the court observed in *G.E.H.*, Plaintiff's requested relief, "[remand] for a *de novo* hearing before a new ALJ who [does] not suffer from the unconstitutional taint of having previously heard and decided this case without lawful authority to do so," (Doc. 16, p. 19) would not cure the alleged constitutional defect or be feasible. First, under Plaintiff's argument, "there is no ALJ who would not suffer from the same defect, [and if every ALJ is constitutionally defective] then any decision in which an ALJ found in <u>favor</u> of Plaintiff would likewise be constitutionally infirm." *G.E.H.*, 2022 WL 4235060 at *9 (emphasis in original). And second, the Court has no authority to remand Plaintiff's case directly to an ALJ or with direction that it be assigned to a different ALJ. *Id*. (citing *Ingram v. Comm'r of Soc Sec.*, 496 F.3d 1253, 1269 (11th Cir. 2007) and 20 C.F.R. § 404.983).

Two weeks later, a district judge in this court also rejected a constitutionality argument to the Social Security Administration's structure in *T.B. v. Comm'r of Soc. Sec. Admin.*, 2022 WL 17478242 (M.D.Ga, Sept. 28, 2022). That judge likewise rejected the plaintiff's presumption of harm argument and, citing the decision in *L.M.*, found that that the plaintiff had failed to set forth how her claim for benefits would have been decided differently or how the absence of the unconstitutional provision would have resulted in a different decision. *Id*. at *4-5.

Plaintiff's argument warrants the same result as these cases. Although here Plaintiff attempts to move beyond any presumed harm by enumerating specific harms to her, i.e. the failure to receive constitutionally valid hearings and adjudication processes before the ALJ and Appeals

Council Judges (Doc. 23, p. 6-7), her challenge still does not answer how her case would have been decided differently in the absence of the unconstitutional provision. This is likely a particularly difficult hurdle for any plaintiff because of the nature of the Social Security adjudicatory process. This point is illustrated by Justice Kagan her *Collins* concurrence: "Consider the hundreds of thousands of decisions that the Social Security Administration (SSA) makes each year…given the majority's remedial analysis, I doubt the mass of SSA decisions – which would not concern the President at all – would need to be undone. That makes sense." *Collins*, 141 S.Ct at 1802. As the court noted in *L.M.* when quoting Justice Kagan, it does make sense, and this Court likewise finds it instructive.

For the reasons cited in the above cases, Plaintiff's constitutional challenge to the authority of the Commissioner, the delegation of authority, and the structure of the Administration itself is without merit and offers no basis for remanding her case.

## CONCLUSION

Based on the foregoing, it is **ORDERED** that the Commissioner's decision be **AFFIRMED**.

**SO ORDERED**, this 23rd day of March, 2023.

s/ Charles H. Weigle
Charles H. Weigle
United States Magistrate Judge